## THE O'BRIEN BROTHERS.

## CONNETT et al. v. CITY OF NEW YORK et al.

(District Court, S. D. New York, June 1, 1926.)

1. **Towage** ⊜⟲11(10)—**Tug held not liable for injury to barge in tow, cut loose after breaking of tug's rudder chain, caused by latent defect.**

A tug, towing three barges loaded with street sweepings to the dumping grounds, broke a link in her rudder chain, and before temporary repair could be made was obliged to cast her tow loose to avoid being herself carried on the rocks by the strong flood tide, with the result that libelant's barge was injured, the chain was new, installed by a reputable concern, and listed as usual; the break being from a latent defect. *Held*, that the tug was not liable for injury to the barge.

2. **Towage** ⊜⟲11(1)—**Tug held not in fault for not trying to use auxiliary steering gear on breaking of rudder chain.**

A tug, which broke a rudder chain while towing barges, with the result that one of the barges drifted on the rocks and was injured, *held* not in fault for not attempting to use her auxiliary steering gear, not designed nor ready for emergency use, and where it was thought that less time would be required to repair the chain.

In Admiralty. Suit by Lyndon R. Connett and John N, Allen, partners as L. R. Connett & Co., against the City of New York, the steam tug O'Brien Brothers, and others. Decree for respondents.

Foley & Martin, of New York City, for libelant.

John P. O'Brien, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., of counsel), for the respondent city of New York.

Bigham Englar & Jones, of New York City, for claimant.

Alexander & Ash, of New York City, for respondent John W. Sullivan Co.

KNOX, District Judge. The damages sustained by libelants' barge Tom arose as a result of the breaking of a link of the starboard chain of the steering gear of the tug O'Brien Brothers, by which she was being towed. The evidence indicates that the break was caused by a latent defect in the chain, not discoverable by inspection. But a few weeks before the accident, a new steering gear for the tug was installed by John W. Sullivan Company, conducting a local repair yard. The concern bears a good reputation, and it appears that its work with respect to the gear was carefully and well done. It had purchased the chain from the Frank Richard & Gardner Company, likewise reputable and of high standing. Before installation, the chain was subjected to all the usual and customary tests for chains of like character. It manifested no sign of defect, and gave no indication of any until the link parted just before the time of the accident.

[1] The tug and its tow of three barges, loaded with street sweepings, were then a little to the southeast of Ward's Island, on their way to Riker's Island, with a strong flood tide under foot. The first intimation that something had gone wrong was when the rudder failed to respond to a starboard wheel. The tug stopped her engines, and began an investigation of the trouble. It was soon located, and immediate efforts were made to repair the broken chain with a "patent link." Owing to the cramped space within which the engineer had to work, the operation was not completed as quickly as was anticipated. Due to the location of the tug, the character of the river bottom, and the swift tide, it was not thought advisable to drop anchor. The tug and tow began to drift, and to be set inshore towards the rocks at Scaly Rock. In order to save herself from coming up there, the tug cut the hawsers to her tow, and by backing managed to keep in the stream. Meanwhile, she was carried upstream towards the pier of Hell Gate Bridge. Before any damage came to her, she was picked up by another tug, which started to tow her to Port Morris.

Before reaching there, temporary repairs to the steering gear were completed, and the O'Brien Brothers went to the rescue of her tow. In the interval, the Tom had come to grief upon the rocks, breaking several of her planks. She soon listed and dumped part of her cargo. At about this time, another tug came to her assistance, and cared for her until relieved by O'Brien Brothers. She was then towed to Riker's Island, where she was beached.

[2] The only possible fault that, in my opinion, can be fixed upon the tug, is that she did not immediately resort to the use of her auxiliary steering gear. Obviously, it was not in condition for instant use. In order to be effective, it would have been necessary to hook up a deck quadrant with the rudder, and this would have required as much or more time than was thought necessary to replace the broken link of the steam steering apparatus. As has been said, the engineer was employed in that task, being assisted by the other members of the crew. The captain remained in the pilot house on lookout. Considering the location of the boat, and the conditions with which she was faced,

,I do not believe that she should be chargeable with fault for failure to do other than she did. Only a short time, to be measured in minutes, elapsed between the breaking of the chain and the imminence of grounding on the rocks. It was believed that the repairs would take but a few minutes, and efforts directed toward that end were rightly undertaken. That they were not completed as quickly as was hoped for is but an incident to the original misfortune.

As for the argument that the auxiliary gear should have been ready for instant use, reference may be had to The Olympia (D. C.) 52 F. 985, affirmed, 61 P. 120, 9 C. C. A. 393, where the lower court said: "Nor does the evidence sustain the imputation of fault founded on the failure to use the relieving tackle. There was no time to bring that appliance into use. It is not intended for use in emergencies demanding prompt action, nor for the navigation of a large steamer in a narrow channel, but it is a temporary steering gear, to be hooked to a tiller in .bad weather, as a safeguard against the consequences of the breaking of the tiller rope, or as a substitute for it, when broken, until it can be repaired. The master of the steamer testifies that it could not have been hooked on ready for use under three to five minutes, while less than three minutes elapsed from the discovery of the break until the collision."

The conditions that existed here are very similar, so far as time and use of the auxiliary are concerned, and I am of opinion that the libel and cross-libels should be dismissed.